## George H. Niles and Another v. John B. Rhodes.

Where several exceptions were taken to the charge of the court, and the same embodied in a bill of exceptions, an assignment of errors in this court "that there is error in this, to wit, that the judge of the said circuit court, at the trial of said cause, gave the several instructions to the jury asked by the defendant, and refused to give the several instructions, or any or either of them, asked for by the plaintiffs," is sufficiently special, and the words "several instructions," must be rendered distributively, and as applying to each.

Where plaintiff presented to defendant an account, for what purported to be foreign wines and ales, opposite each item of which were added the words "imported and sold in the original packages," and defendant admitted the correctness of the account,—*Held*, that this was not such "positive proof" that they were "imported under the laws of the United States, and in accordance therewith, and contained in the original packages in which they were imported, and in quantities not less than the laws of the United States prescribe," as is required by the Prohibitory Liquor Law to entitle the seller to recover therefor.

Whether the admission of the party could, in any case, be considered positive proof within the meaning of this provision, *quære*.

*Heard October 8th & 11th. Decided November 10th.*

Error to Wayne Circuit.

Niles & Van Anden brought suit in the court below, against Rhodes, for the price of a bill of liquors. On the trial, to prove their case, they called Charles P. Crosby, who testified as follows:

"I am the attorney of Niles & Van Anden, the plaintiffs in this suit. On or about the twentieth day of November, A. D. 1857, I called the [defendant John B. Rhodes, into my office in this city, and called his attention to a bill which I now hold in my hand, and asked him to pay it. He took the bill and examined it, and said it was correct, except that he thought there was a credit of twenty-five dollars which he was entitled to, which was not credited on the bill." The bill referred to was then read in evidence, and was in the words and figures following:

"DETROIT, Michigan, 1857.

Mr. John B. Rhodes,

Bought of Niles & Van Anden,
Wholesale dealers in Imported Wines, Liquors and Cigars,

Woodward Avenue, under Russell House, formerly National Hotel:

May 7, 1 basket Piper's champagne, qts. imported and sold in original packages, . $16,00

May 7, 1    "    "    "    "    pts. .    .    17,00

———— $33,00

May 13, 1 cask Muirs & Son's Sparkling Edinburg ale, 6 doz. qts. at $3,75 per doz., imported and sold in original packages,    .    22,50

May 22, 1 basket Piper's champagne, pts. imported and sold in original packages,    .    17,00

May 25, 1 cask, 8 doz. Barclay, Perkins & Co. London porter 19s imported and sold in original packages,    .    .    .    .    .    16,63

May 28, 3 baskets champagne, $16, imported and sold in original packages, .    .    .    48,00

June 17, 2    "    "    "    $16, $17, .    .    33,00

June 20, 5 demijohns,    .    .    .    .    .    5,00

————$175,13

CR.

Sept. 22, by cash on above, .    .    .    .    25,00

Balance due,    .    .    .    .    .    .$150,13

The plaintiffs then called Oliver Bourke, who testified as follows:

"I am a dealer in liquors; the articles mentioned in this bill, if real and genuine, are of foreign production. Barclay & Perkins' ale is of foreign production, and is made in London, England. This I know of my own knowledge. I have been at their brewery in London. Real and genuine champagne is made in a district called Campagne, in France. There is no champagne manufactured out of France.

On being cross-examined, he said: "I do not know anything about this bill; I have seen articles of the kind mentioned in the bill offered for sale in bond, and duty paid."

On his re-direct examination, he said: "There is not any

genuine Piper's ·champagne made in this country; all real champagne is made in France."

The plaintiffs here rested their case, and the cause was thereupon submitted to the jury under the charge of the circuit judge. The counsel for the defendant requested the circuit judge to charge the jury:

That to find a verdict for the plaintiffs they must be satisfied, from positive proof in this case, that the wines and ales mentioned are of foreign production, and were imported and duties paid thereon under and in accordance with the laws of the United States. The .circuit judge did so charge, and plaintiffs excepted.

The defendant's counsel also requested said circuit judge to charge the jury, that the admission of the defendant that the account proved was correct, is not positive proof that the wines and ales were of foreign production, and imported under the laws of the United States, and in accordance therewith. This charge also the judge gave, and plaintiff excepted.

The defendant's counsel also requested the circuit judge to charge the jury, that to entitle the plaintiffs to recover for domestic wines and ales sold, they must prove them to be of domestic manufacture. And the judge charged the jury that the party claiming the benefit of the exemption of domestic wines from the operation of the statute, must prove himself within the exception. To which charge plaintiffs also excepted.

Plaintiffs' counsel then requested the judge to charge the jury, that admissions of the defendant are positive proof within the meaning of the statute.

Also, that if the jury find, from the evidence before them, that the liquors sold were of foreign production, the legal presumption arises from that fact, and the fact of their being sold here, that they were regularly imported in accordance with the laws of the United States.

Also, that if they found, from the evidence before them

NILES v. RHODES.

that the wines (mentioned in the bill) were of domestic pro-
duction, a recovery for the price thereof is not prohibited
by law. All which requests the judge refused, and as to
the first two charged directly the contrary; and plaintiffs
excepted.

Judgment having passed for defendant in the court be-
low, plaintiffs brought error, and assigned errors in this
court as follows:

"And now come the said plaintiffs by Chas. P. Crosby,
their attorney, and say that in the record and proceedings
aforesaid there is manifest error, in this, to wit: That the
judge of the said circuit court, at the trial of the said cause
in that court, gave the several instructions to the jury asked
for by the defendant, and refused to give the several instruc-
tions, or any or either of them asked 'for by the plaintiffs.
And also that judgment was rendered by the said circuit
court in favor of the defendant in said court, and against
the plaintiffs; whereas, by the law of the land the plain-
tiffs in the said said circuit court should have had judgment
against the defendant. Therefore the said plaintiffs in error
pray that the judgment aforesaid may be reversed and held
for nought, and for judgment against the defendant."

*Whittemore & Crosby*, for plaintiffs in error.

1. The law only requires positive proof of the *character*
of the wine — whether foreign or not — and not of the man-
ner and mode of importation. Being both penal and in der-
ogation of the common law, this act must be strictly con-
strued. But we claim this to have been its real intent, and
that such intent is alone consistent with the exemption of
foreign liquors from the operation of the statute, as expres-
sed in the first words of the section under consideration.
The construction given by the circuit judge would effectu-
ally defeat this exemption, in practice.

2. But the admissions of the party are positive evidence.
They clearly partake in no degree of the nature of circum-

7 MICH—Z.

stantial evidence. And the wine being thus, and by the testimony of Bourke, proved positively to have been of foreign production, and imported and sold in the original packages, the conclusion necessarily follows that it was imported according to law, and the duties paid. — 3 *Bl. Com.* 371; 1 *Greenl. Ev.* §§ 14, 34, 40.

3. The statute exempts all foreign and domestic wines from its operation, subject only to the restriction as to quantity and original packages in the case of those which are foreign. And as all must be either foreign or domestic, all are excepted unless outside this restriction. Sec. 1661 of Comp. Laws does not prohibit the sale of wine, and the *onus* is on defendant to show it to be foreign, and bring his case within the prohibitions of the statute. If he show it to be domestic wine, it may be lawfully sold; and so also if he show it to be foreign, unless smuggled in, or not sold in the original packages. And when it is admitted to be foreign, we have a right to go to the jury on the presumption rising from that fact that the duties have been paid, since the law will not presume the commission of crime.

*Holbrook & Bishop,* for defendant in error.

There is no special assignment of errors as required by rule 12. — 7 *Ind.* 580; 23 *Pa. St.* 198; 24 *Ibid.* 286; 1 *Kern.* 416.

There was no error in the charge of the court.

CHRISTIANCY J.:

A preliminary objection is made to the form in which the errors are assigned. The 12th rule requires every assignment of error to be special. By this we understand that every error relied upon must be pointed out with such certainty that the defendant in error, and the court, may see from the assignment itself, every particular ground upon which a reversal of the judgment is claimed, and that the record may always disclose the grounds upon which the judgment may have been reversed or affirmed.

There were, in the court below, three distinct requests to charge, made by defendant's counsel in writing. The court in answer to these several requests, charged substantially as requested. The counsel for plaintiffs also made three separate requests to charge, each of which was refused. In answer to two of these the court charged directly the contrary, without qualification, and simply refused the last. To each of these charges and refusals plaintiffs took a distinct exception. These several requests, refusals and charges, are separately and distinctly set forth in the bill of exceptions. The assignment of errors clearly refers to the bill, which is thus in effect made part of it. By this reference the errors complained of become as certain and specific, as if the assignment had repeated each of these separate requests, refusals and charges, in *hæc verba*, with the usual allegation of error to each; and needless repetition is avoided. The words "several instructions" used in the assignment are to be rendered distributively as applying separately to each. True the assignment does not, in so many words, allege any error in the instructions given in answer to the first and second of the plaintiffs' requests, but as these instructions were the direct contrary of the requests, and exceptions were taken to the refusals, the same questions are raised. This form of assignment would not, of course, be sufficient in any case where the grounds of error relied upon were not rendered certain by reference. Here they could have been rendered no more certain by repetition in the assignment.

We must therefore consider the questions presented by the exceptions. Before doing so it may be well to take a general view of some of the main features of the statute under which the questions arise.

By the first section, "No person shall be allowed to manufacture or sell at any time, by himself, his clerks, servants or agents, directly or indirectly, any spirituous or intoxicating liquors, or any mixed liquors, a part of which

is spirituous or intoxicating, [except cider, beer, and wine of domestic manufacture,] and except, also, as hereinafter provided." I have placed in brackets the words inserted by the amendment of February 17th, 1857.

The second section is in the following words:

"SEC. 2. All payments for such liquors hereafter sold in violation of law, shall be considered as having been received without consideration, and against law and equity, and any money or thing paid therefor may be recovered back by the person so paying the same, his wife, or any of his children; and all sales, transfers, grants, releases, quitclaims, surrenders, mortgages, pledges and attachments of real or personal estate, and liens and securities thereon, of whatever name or nature, and all contracts or agreements relating thereto hereafter made, the consideration whereof, either in whole or in part, shall have been the sale or agreement to sell any such liquor, shall be utterly null and void against all persons and in all cases, excepting only as against the holders of negotiable securities, or the purchasers of property who may have paid therefor a fair price, and received the same upon a valuable and fair consideration, without notice or knowledge of such illegal consideration; nor shall any suit at law or in equity be had or maintained upon any contract or agreement whatever hereafter made, the consideration whereof shall be either wholly or in part the sale of such liquors in violation of law, excepting only when such suit is brought by such *bona fide* holders of negotiable paper, or purchasers of property without notice: nor shall any demand, arising upon any such contract or agreement whatever, be offered or allowed as a set-off or defense in any action whatever."

By the third. and several following sections heavy penalties are imposed for the sale of liquors in violation of the law.

By the fourteenth section those sellers of drugs and

medicines, and those only, are exempt from the penal provisions of the act, whose sole or principal business is the selling of drugs and medicines other than intoxicating liquors, and who shall, with ˏsufficient sureties, give bond to the People of the state, a part of the condition of which is, that they will not sell any such liquors except to be used as medicines, as a chemical agent, in scientific, mechanical or manufacturing purposes, or wine for sacramental purposes; that they will sell to no one who they have reason to believe intends to use it as a beverage, &c. This section further requires certain precautions to be exercised by such druggists: they are to make special inquiries of the persons to whom they sell, of the purposes for which it is intended; and if they sell without the proper answers to such inquiries they lose the benefit of the exception in their favor. And if any person shall make false answer to such inquiries he becomes liable to the same penalties as for selling.

By the nineteenth section it is provided, that this act shall not be construed as prohibiting the manufacture of the alcohol of commerce, containing not less than eighty per cent. of pure alcohol; Provided that the manufacturer shall not be at liberty to sell the same within this state, excepting only to the persons who may have given bond pursuant to section fourteen.

The twentieth section is in the following words:

"Sec. 20. The provisions of this act shall not be construed to apply to such liquors as are of foreign production, and which have been imported under the laws of the United States, and in accordance therewith, and contained in the original packages in which they were imported, and in quantities not less than the laws of the United States prescribe. To entitle any liquors to the exemption contained in this section, it must be made to appear by, positive proof, that they are of the character in this section described; nor shall custom house certificates of importa-

tion, and proofs of marks on the casks or packages corresponding therewith, be received as evidence that the liquors contained in such packages are those actually imported therein."

In view of all these provisions, and of the act as a whole, I think it very clear that the effect of the act is to establish, as a general rule, that the sale of intoxicating liquors, including ale or beer, and wine, and contracts made wholly or in part in consideration of such sales, are void and illegal; that the legality of such sales, and of such contracts, can only be maintained in virtue of some specific exception of the statute which has the effect to take the particular sale or contract out of the general prohibitions of the act.

Illegality is the rule; legality, the exception. And the party claiming the benefit of the exception, in civil cases, takes upon himself the burden of proving his case within it.

Such was, by the unanimous decision of this court, held to be the rule in *Paton v. Coit,* 5 *Mich.* 505 ; not only in reference to the exception in the second section, in favor of *bona fide* holders of negotiable paper, but also as to the sale of the liquors there mentioned.

The plaintiffs in this case could not, therefore, be allowed the benefit of the exception in the first section, exempting cider, beer and wine of domestic manufacture, without showing that the liquors sold were of the description in this section excepted. But the plaintiff's bill, and the only one upon which he sought to recover, purported on its face to be for imported wines, ale and porter. He claimed pay for it as such, and all the evidence introduced, whether admissible or not, tended to show they were of foreign production. There was not a word of evidence, nor a circumstance, tending to show them of domestic manufacture. The jury could not, without a clear violation of their oaths, have found them to be of the latter description; had they done so, it would have been the duty of the court to set aside the verdict.

The court was therefore clearly right in charging according to defendant's third request, and in refusing the third request of the plaintiffs.

But it is argued by plaintiffs' counsel, that all wines and ale must be either domestic or foreign: that the former are exempt under the first section, the latter under the twentieth section; and therefore, that all wines and ale are exempt from the operation of the act.

This argument lacks but one element of conclusiveness, and that is the truth of the premises. It assumes that the fact of foreign production is, of itself, sufficient, under the twentieth section, to exempt beer and wine from the prohibitions of the act. But the fact is directly the reverse. It is (since the amendment of the first section) their foreign character alone which deprives them of the benefit of the exception, in this or the first section, until other facts are shown. If shown to be domestic, they are, since the amendment, exempt. If shown to be foreign, without further proof, or if, as we shall presently see, the plaintiff claims to recover for the sale of them as of foreign production, they are subject to all the prohibitions of the act, *until* they are brought within the exemption contained in the twentieth section, by proof that they "have been imported under the laws of the United States, and in accordance therewith," and that when sold, they were "contained in the original packages in which they were imported, and in quantities not less than the laws of the United States prescribe."

The plaintiff, therefore, when suing to recover the price of wine and beer, sold since the amendment of the first section, can not be required to prove that they are of foreign production, any further than the fact of importation may show them to be so; as this would be requiring him to prove a fact, the only tendency of which, by itself, is to defeat his action, by bringing the sale within the prohibitions, and not within the exceptions, of the act. The plaintiff is interested to disprove the foreign character of such liquors.

He, therefore, may, if he choose, as the plaintiffs did in this case, come into court, claiming and admitting its foreign character; thus admitting the sale *prima facie*, or presumptively illegal, and may then take upon himself to remove this presumption by showing that it was imported according to the laws of the United States, sold in original packages, &c. The object of the statute is to require clear proof of the legality of the sale; and the fact of its foreign production, only tending to show its illegality, and being, therefore, against the plaintiff's interest, and in accordance with the presumption of the statute, may thus be taken upon his admission. Nor can it be for the defendant to prove them foreign, when the plaintiff in open court admits it, and claims to recover for them as such. The charge of the court, therefore, so far as it required the plaintiffs to prove the liquors to be of foreign production, was erroneous. But whether this error was material will be seen when we come to another branch of the case.

No liquors are exempted from the prohibitions of the act simply because they are foreign. So far as the act makes any distinction between liquors of foreign and domestic production, it is in favor of the latter. And it is quite manifest from the whole act, that the exception in the twentieth section, was not made because the liquors were of foreign production, but to avoid coming in conflict with the Federal laws regulating foreign commerce and importations. It is evident the Legislature acted upon the idea, that it might not have the power to prohibit the sale in original packages, of liquors imported according to the laws of the United States. — See *Brown v. State of Maryland* 12 *Wheat.* 419, and *License Cases,* 5 *How.* 504 to 633. And this section shows very clearly the intent to prohibit the sale of foreign liquors, so far as it was competent to do so without the risk of conflict with the Federal laws, in a point where the latter were supposed to be paramount. But while they could not prohibit the sale, when permitted by

the laws of Congress, it was competent for the Legislature to require strict proof of full compliance with those laws which alone stood in the way of a complete prohibition. Of this power they availed themselves to the utmost, by requiring positive proof, and by providing that custom house certificates, and proofs of the marks on the casks, &c., should not be received as evidence that the liquors contained in such casks, &c., were those actually imported therein.

The primary object of requiring this strictness of proof, even before the amendment exempting wine and beer of domestic manufacture, was not so much to show that the liquors were of foreign production, as to show that they had been imported according to the Federal laws, sold in original packages,. &c. In other words, that the sale was such as the Legislature did not claim the power to prohibit.

In view of these considerations, to construe the language of this section, in reference to the " character" of the liquors of which positive evidence is required, as confined simply to the *foreign* character of the liquors, must defeat the primary object of the statute; and this though the act had remained in its original shape. Still more clearly must it defeat its object as amended.

The construction contended for by the plaintiffs finds as little support in the language as in the object of the statute. That portion of the twentieth section immediately preceding that which requires positive proof of the character of the liquors to be exempt, prescribes several distinct requisites in order to entitle the liquors to exemption under this section: they are all connected by the copulative conjunction, and it would be quite as reasonable, at least, to hold that positive evidence was only required as to any other of these requisites, as of its foreign production, even if the act were in its original shape. But it is claimed that the subsequent provision against the reception of custom house certificates and marks as evidence, has the effect to confine the word " character," and therefore the positive proof required, to

their character as foreign or domestic, according to the rule, *expressio unius est exclusio alterius.* It is difficult to see any application of this rule to the present case. This latter provision as to certificates and marks, has quite as direct a bearing upon the fact of importation according to the laws of the United States, and to that of being contained in the original packages, as it has to the foreign character: it bears, in fact, upon all. The rule cited is by no means universal, and can scarcely be said to be a general one. It is one always requiring great caution in its application, as it is often difficult to distinguish between instances expressly enumerated in a statute only as illustrations, and those intended to restrict a more general provision to the particular instances enumerated. The rule itself, like most other minor rules of construction, can only be applied as subordinate and auxiliary to the great cardinal principle, which requires the construction to be according to the intent of the Legislature to be gathered from the whole statute; and where that intent is clear without it, as it is here, the rule has no application. The particular provision forbidding custom house certificates and marks as evidence of identity, is only, I think, to be treated as explanatory of the provision requiring positive proof— as inserted *ex abundanti cautela* — to remove any doubt which might exist, whether such certificates and marks could be considered positive proof of the identity of the liquors imported.

From these considerations it results, that positive proof was required that the liquors in question, in this case, were imported under the laws of the United States, the duties paid, and all the requisites of the law complied with, and that they were contained in the original packages in which they were imported, and in quantities not less than the laws of the United States prescribe.

Was the defendant's admission of the correctness of the bill, when presented to him, as testified by the witness, such positive proof as the statute requires?

Independent of the statute, the evidence would doubtless have been sufficient that the amount shown to be due by the bill was correct, and perhaps that it was due for the particular quantities of ale, beer and wine respectively, stated in the bill. To this extent the party having a bill presented to him would naturally look: but the admission here proved would not, independent of the statute, be very satisfactory or conclusive evidence, though admissible, of its importation according to the laws of the United States, nor of its having been sold in the same original packages in which it was imported—though these things were carefully inserted in the bill. He may or may not have known whether these facts were true or false. The weight to be given to admissions depends upon the circumstances under which they are made, and the mode in which they are proved. Such evidence, though often the most satisfactory, is sometimes the most dangerous and least satisfactory of any. — See 1 *Phil. Ev. by Edwards*, 462.

But the only question here is whether defendant's admissions constitute *positive proof*, within the meaning of this statute. It is contended by plaintiffs' counsel that the statute can not be construed to intend, by positive proof, such only as will establish the fact in controversy as an absolute certainty, beyond the possibility of doubt; as this would be to exclude all human testimony; but that, by positive proof, we are to understand the statute to require *direct* proof, as contra-distinguished from that which is circumstantial or merely presumptive.

This view, I think, is substantially correct; or, in other words, the statute requires the sanction of an oath to the facts in controversy. Mr. Greenleaf, in his work on evidence, uses the terms "*direct and positive*" as synonymous, and as opposed to circumstantial or presumptive evidence. — *Vol.* 1, '§ 13. Tried by this test, however, the admissions of the defendant in this case must be excluded, as neither direct nor positive. To constitute direct or

positive proof, as distinguished from circumstantial or presumptive, it must apply directly and immediately to the *factum probandum*, or fact to be proved, without any intervening process. If it apply immediately only to collateral facts from which the fact in controversy is inferred, in consequence of the connection, near or remote, which may be supposed to exist between the collateral facts and the fact in controversy, it is, according to the definition of Mr. Greenleaf, circumstantial or presumptive only. — See 1 *Greenl.* § 11 *and* 13; and see 1 *Phil. Ev.* 4 *Amer. ed. by Edwards*, 598.

Here the *facta probanda*, or facts in controversy, were, the importation of the liquors according to the laws of the United States, payment of duties, their sale in the original packages, &c. No witness here testifies to these. But these facts are sought to be inferred or presumed from the collateral fact of the defendant's admission of them. The force of this inference, even if the admission had been clear and direct, must depend entirely upon the presumption, that, being against his interest, he would not have made the admission, if the facts admitted were not true. It is this presumption alone which makes admissions of this kind any *evidence of the facts admitted*, more than hearsay evidence generally. It is true there is another ground on which they are admitted, as will be presently noticed; not strictly as evidence of the facts admitted, but as a *substitute for* proof of those facts. But as *evidence in themselves of the facts* admitted, they are but hearsay, and tend to prove the facts admitted only by reason of the presumption above mentioned.

"No evidence," said Mr. Justice Buller (*N. P.* 294), "is to be admitted but what is on oath; and if the first speech was without oath, an oath that there was such a speech makes it no more than a bare speaking, and so of no value in a court of justice." Such would be the precise objection to the admission here in question, but for the presumption mentioned.

Mr. Phillips, in his excellent work on evidence (*vol.* 1, *p.* 402, 4 *Amer. ed. by Edwards*), treats admissions by parties as merely an exception to the rule excluding hearsay, and as being admitted in evidence chiefly on the ground of the presumption that, being against the party's interest, he would not have made the admission if not true. Mr. Greenleaf (*vol.* 1, *sec.* 169), as to admissions of the character now in question, impliedly, I think, admits the correctness of the view taken by Mr. Phillips, but takes a distinction between these and certain other admissions. I quote his language:

" Under the head of exceptions to the rule rejecting hearsay evidence, it has been usual to treat of admissions and confessions by the party, considering them as declarations against his interest, and therefore probably true. But in regard to many admissions, and especially those implied from conduct and assumed character, it can not be supposed that the party, at. the time of the principal declaration or act done, believed himself to be speaking or acting against his own interest; but often the contrary. Such evidence seems, therefore, more properly admissible as a *substitute* for the ordinary and legal proof, either in virtue of the direct consent and waiver of the party, as in the case of explicit and solemn admissions, or on grounds of public policy and convenience, as in the case of those implied from assumed character."—See *Ibid.* § 27.

Now, if the principle laid down by Mr. Greenleaf, in the passage just quoted, be correct, there is even less ground for holding the admissions in the case before us positive or direct proof, than under the principle stated by Mr. Phillips. For, according to the principle stated by Mr. Greenleaf, they are not received as evidence tending to prove the facts themselves, but as a substitute for such proof, on the ground of waiver, consent, or public policy and convenience.

The provision requiring positive proof, I regard as in-

tended to deprive parties of the right, by any arrangement between themselves, to make evidence differing from the actual facts of the case, or to create any substitute for the proof of such facts.

Now, in cases where the interest of the plaintiff or defendant is alone in question, they are, of course, competent, if they see fit, to waive the proof of any fact which might operate against them, and to consent that it may be taken as true; in other words, to make an admission of the fact, as a *substitute* for proof of it. But the case before us is not of this character. It is not chiefly, if at all, for the protection of the purchaser of foreign liquors that the positive proof of the facts here in question is required; but for the protection of the public, to discourage the sale and the drinking of intoxicating liquors, which the statute, in its whole scope, assumes to be a public evil. It is on this ground that the defence here set up is allowed by the statute, and not for the sake of the defendant (for as to the defendant such a defence is often dishonest and unconscionable). While, therefore, a defendant may waive his own rights, and consent to admit the facts without proof, he can not so easily waive the rights of the public, which are not his to be waived. The public have a right to insist upon the proof of the facts themselves, and to refuse to be bound by the mere admissions of the parties, made out of court, and not with reference to any suit. This, I think, the public have done by the statute before us, by requiring positive proof. And whether, in ordinary cases, admissions are to be considered in the light of direct or presumptive proof, is not material in the present case. The only question here is, whether the particular admissions here in question can be considered *positive* proof under *this statute;* and, it seems to me, they fall very far short of that character, under any definition that can reasonably be given to the term *positive proof.*

If the statute be construed to require no different kind

of evidence from that which would have been required without it, the whole provision is rendered senseless. If, under this provision, mere admissions like this are not excluded, I can see no reason why any evidence should be excluded by it which would have been admissible without it; for the same course of reasoning which will make such admissions receivable under it, will, I think, admit any other evidence which would have been receivable had this provision never been enacted; and the statute is wholly disregarded, or the court evades the duty of its construction by referring it to the jury.

Admissions made in open court, or expressly for the purposes of a trial, stand upon a somewhat different ground, being analagous to admissions made in pleading.—1 Greenl. § 27. Upon admissions of the latter description, I express no opinion, as they are not involved in the case. Nor, for the like reason, do I express any opinion upon the admissibility of custom house certificates and marks on casks, &c., to prove facts other than that of the identity of the "liquors imported therein." But as the statute excludes them as evidence to show that the *liquors in question in the suit* were imported, and the duties paid, &c., they can be of little importance.

It is not necessary here to consider whether some other possible construction might not be adopted, not in accordance with the ordinary import of the language, if, in the nature of things, direct or positive evidence of the facts in controversy were impossible; or if there was a clear defect of legislative power to require direct or positive proof. It is easy to perceive that there is nothing in the nature of the facts in controversy here to render direct or positive evidence impossible or impracticable. No one, in a case like the present, would be bound to trace back the liquors beyond the custom house. And proper precautions on the part of those who purchase from the importers, would enable them to identify the liquors, and to prove all

the necessary facts by positive evidence.    It is true it may
be inconvenient, and, perhaps, expensive; but these consid-.
erations present only a question of expediency, not of legis-
lative power.    Such questions are for the Legislature, and
not for the courts.    There was no error in the charge of
the court below, nor in the refusals to charge, except that
already noticed in the charge in answer to defendant's first
request.    And there being no legal evidence in the cause
from which a jury could, under any proper charge, have
found a verdict for the plaintiffs, this slight error becomes
entirely immaterial.

The judgment of the court below must be affirmed.

MANNING J.:

I do not think the admissions of defendant are positive
evidence, within the statute, that the liquors in question had
been imported under the laws of the United States, and that
they were sold to defendant in the casks and packages in
which they were imported.    It is doubtful whether anything
more can be claimed for them than that defendant had pur-
chased of plaintiffs liquors to the amount stated in the bill.
Conceding, however, they go to the extent claimed, that is,
to all the requirements of the statute, I still think them not
such evidence as the statute requires.    It is clear, to my
mind, the Legislature intended the evidence should be of
such a character as not to leave a reasonable doubt on the
subject.    This is evident from that part of the section which
declares custom house certificates of importation, and proofs
of marks on the casks or packages corresponding therewith,
shall not be received as evidence that the liquors contained
in such packages are those actually imported therein.    Such
evidence would, for all ordinary purposes, when uncontra-
dicted, be sufficient proof that the liquors in the casks and
packages were the liquors imported in them.    But the Legis-
lature foresaw that the law might be evaded by a change
of the liquor after the casks or packages had left the cus-

tom house, and before a sale. The custom house marks and certificates are not excluded as evidence. They are competent proof of the importation of the casks or packages with liquor in them, but they are not of themselves, under the statute, evidence that the liquor in them at the time of sale was the same identical liquor imported in them; and to prove this, other and additional evidence must be given. They are more satisfactory proof the statute has been complied with than the confessions 'of parties would be under any circumstances. In the making of them, there is no inducement to evade the law, while parties to a sale of liquors are not wholly free from such an imputation.

In a prosecution against a vendor for selling liquor, the declarations of the vendee would not be evidence; and what would not be evidence in such a case, to bring the transaction within the exception of the statute, is not competent for that purpose in an action brought for the price of the liquor by a vendor against a vendee. The statute requires no greater evidence in the one case than in the other. The policy of the law is the same in both. It not only imposes a penalty on the vendor for selling, but declares the contract of sale void, authorizes the money or other thing paid by the vendee to be recovered back by him, and declares all sales, transfers, and all grants of real and personal estate, in consideration of such sale, utterly null and void.

In a suit for liquor sold, the public, as well as the parties, are interested, and the question is not what the parties have said in regard to it, but whether the transaction was within the exception of the statute.

I think the judgment should be affirmed.

MARTIN Ch. J.:

The object of the act of February 3d, 1855, was, as its title indicates, to prevent the manufacture and sale of spirituous liquors as a beverage. This object stands prominently forth in all its provisions, and can not be lost sight

7 MICH.—2A.

of in the construction of the act as a whole, or in that of any of its parts. But as liquors of foreign production, imported according to the laws of the United States, were not, if sold in the original packages, supposed to be within the scope of the state legislation, and as the Legislature designed expressly to except them from the operation of the act, provision was made by the twentieth section for such exception, and, at the same time, for protection against evasion of the law by the fraudulent use of casks and packages having government marks, and of custom house certificates. It was well understood that the cask or package, with its mark, was a customary means of imposition upon the public, by the manufacturers and vendors of intoxicating liquors; while custom house certificates were as easily transferable as the casks themselves. Hence, it was enacted that *positive* proof of the foreign production of the liquors, and of their importation, and of their being contained in the original packages in which they were imported, should be requisite to a recovery for liquors sold; and that such casks, marks, and custom house certificates should not afford such evidence. As, however, under the act, as it was amended in 1857, wine, beer, and cider, of domestic manufacture, are excepted from its operation, I concur with my brother Christiancy that the plaintiff, as he sought to recover for foreign wines and ale, and in his action claimed them to be such, would not be required to show anything further than that they were lawfully imported, and sold in the original packages. This follows from his claim of their foreign character; as, had his claim been for the sale of domestic wines and ale, proof only that they were of domestic manufacture would be required. In other words, as wines and ale are either of foreign or domestic manufacture, they are either excepted from the statute, or may be sold, if imported according to law, and offered in the original package. The reason, then, for proof of their foreign character, does not exist in actions

for the price of these liquors as it does in actions for that of ardent spirits; for these, whether foreign or domestic, are not within the exception of the first section, but only of that of the twentieth.

But, as in this case, no proof was offered that the wines and ale were imported, and the duties paid, the error of the judge in his charge in this particular, I regard as purely technical, and unimportant.

The circuit judge was correct in charging that the admission of the defendant was not positive proof that the wines and ales were of foreign production, and imported under the laws of the United States, and in accordance therewith. If the admission were admissible as evidence, its weight was a question for the jury. But what was that admission, and under what circumstances was it made? Crosby, one of the attorneys of the plaintiffs, having the demand for collection, presented it to Rhodes for payment. The bill, it is true, describes the liquors as imported, and in the original packages; but it does not allege that the duties were paid, and, if smuggled, they would still answer the description of the bill. The admission, then, if receivable, would not cover the requirements of the law. But Crosby, in presenting the bill, had in view only its payment, and his presentation and demand only suggested to Rhodes, the inquiry whether the bill was correct in items and amount. The very utmost, beyond this, that Rhodes' admission of its correctness can be claimed to embrace, is, that the bill, in its items, corresponds with the representations of the plaintiffs, as to the character of the liquor sold to him. Rhodes' admission, therefore, can, upon no reasonable ground, be held to embrace more than the correctness of the items and prices contained in the bill; and it is claiming too much to insist that he thereby admitted facts to which his attention was not directly called; or those which can not be presumed to have been within his knowledge; or, still more, those to which the bill makes

no reference. The truth is, the fair construction of the admission is, that he admitted the purchase of the articles charged, and for the prices demandèd. Now, an admission, before it can be made evidence, must clearly appear to have been made deliberately and distinctly to the fact to which it is claimed to relate, and the attention of the party making it must appear to have been directed to the subject it is claimed to embrace. No one can reasonably suppose that Crosby, when he presented the bill for payment, called Rhodes' attention to any such facts as it is now contended are involved in his admission of the correctness of the bill; and his reply that it was correct except that he thought he was entitled to a further credit not given in the bill, shows that his attention was directed solely to the amount of his indebtedness. If the question had been left to the jury, I can see no reasonable ground upon which they could have found Rhodes' admission to have embraced anything beyond his liability, and it was most certainly not the duty of the court to give the extraordinary effect to the admission which is claimed for it by the plaintiff's counsel.

Nor did the circuit judge err in refusing to charge that admissions of the defendant are positive proof, &c. Whether admissions are or may be positive proof, or not, is a question of law with which the jury had no concern. It was, under the statute, one of competency, not of sufficiency; and, as such, must have been determined by the judge upon the question of their admissibility. This is especially the case under the statute which defines the evidence requisite to establish a right of recovery.

But whether admissions can, in no case, be received as such evidence, is a question upon which much controversy exists. I do not, however, regard it as fairly before us in this case, and shall therefore express no opinion upon it. It is sufficient for a court to declare the law as applicable to the case before it, without dealing in abstract principles, with which juries have no concern. And here is the error

of the plaintiffs' counsel in the request to the court below. Whether admissions are positive proof or not, was immaterial to the jury, and to the court, until one was proven. The request was to charge an abstract proposition of law, and one which belonged to the court alone, to be applied in the exclusion or reception of testimony—and under such circumstances no error can be assigned, even for the refusal to charge a true proposition of law. The court could only have been requested to withdraw the evidence by admission from the consideration of the jury, or to have instructed them as to the manner of considering it. I can conceive of no greater hindrance to the course of justice than the habit of requesting a charge of abstract propositions of law, having no special reference to the case, or with the duty of the jury. Such a charge, if given, would only tend to confuse and mislead, and it is not the duty of a court to give it—nor can error be assigned upon a refusal.

I think the judgment should be affirmed.

CAMPBELL J. *dissenting:*

As I do not concur in the result arrived at by my brethren in this case, I proceed to give my reasons for dissent upon such points as appear to me necessary to the decision.

I agree entirely with the opinion expressed, that, inasmuch as the only evidence offered below was given to prove a sale of foreign liquors, there was no room for any question about domestic liquors, and that the refusal of the circuit judge to charge that recovery for the price of domestic wines can not be had, was immaterial; and its incorrectness was, therefore, no ground of exception. I also agree that foreign wine does not differ, in its character under the statute, from other foreign liquors.

I deem it therefore unnecessary to decide whether upon proof of the sale of wine, ale or cider in this state, with-

out further testimony as to its origin, the burden of proof
is thrown on the defendant in an indictment, or the plain-
tiff in an action for goods sold.  The case of *Paton v. Coit*
decided that where a note is given upon an illegal sale,
proof of the illegal consideration threw upon the holder
of the note the burden of proving himself a *bona fide*
holder.  The illegality of the sale was not discussed, but
taken for granted by counsel.  As whisky of domestic
manufacture is absolutely prohibited in all cases, and as
foreign whisky is only exempt under certain circumstan-
ces, I ;admit the correctness of the assumption in that
case.  But, as I conceive there may possibly be a differ-
ence in the case of such liquors as are permitted to be
sold when of domestic manufacture, I shall reserve my
opinion upon that special class.  As the liquors here were
shown to be foreign — as far as the proof goes — the case
must fairly stand upon that hypothesis.  The plaintiffs'
testimony was all put in to establish their foreign, charac-
ter.  As foreign liquors, there is no doubt, in my mind,
of the duty of the plaintiffs to show they were within
the saving clause applicable to imported liquors.

This was sought to be ` proved, partly by the testi-
mony of a witness (which was admitted, and upon which
no question is therefore made), and partly by the admis-
sions of the defendant Rhodes.  The ruling of the court
below excluded all proof by admission, either that the
liquors were foreign (which, however, was not in ques-
tion here), that they were in the original package, or
that they were imported under and in accordance with
the laws of the United States.  This ruling was upon the
ground, which is maintained by my brother Christiancy,
that admissions are not within the range of direct or
positive evidence, but fall within the class of circumstan-
tial or presumptive proofs.

I think this ruling was wrong.  How much value should
be given to admissions is not a question to be considered

here. The jury will, in each case, give them as much or as little weight as they deem them entitled to receive. It is admitted by every one that the question before us is not how much proof is needed, but only what kind of proof is to be let in. And, allowing the right of the jury to give the evidence offered just so much value as it may be worth in their opinion, I have been able to find no good reason for its entire exclusion.

The design of the twentieth section of the Liquor Law was, I agree, to avoid any interference with lawfully imported liquors, so long as they remain in the original package. But I do not perceive, in the language of that section, anything to show that the Legislature intended to occupy any doubtful ground. On the contrary, I think that (so far as imported liquors are concerned) they designed to interfere with no right which could fairly be claimed, either of property or evidence of property, and that the references in the section clearly prove this. As they have a bearing upon what is meant by positive proof, I will briefly refer to them.

By the Customs Act, of 1799 (1 *Stat. U. S.* 658-9) all casks, chests, vessels and cases of spirits, wines and teas, are required to be branded or otherwise durably marked by the government officers, with certain marks therein prescribed. It was made the further duty of these officers to give corresponding certificates of the whole invoice, to be held by the importer, and a separate certificate for each parcel to acccompany such parcel wherever it should be sent, within the limits of the United States, "*as evidence that the same have been lawfully imported*" (Secs. 40 and 41). This provision requiring separate certificates for wines, has been repealed, but remains in force as to the other articles. By section 43, the omission to deliver these certificates to purchasers, is made punishable by a penalty of fifty dollars for each omission. And by the next section a double penalty is imposed for

selling or removing any package which has been emptied, without surrendering the certificate, and having the marks obliterated by the authorities.

These are very clearly the marks and certificates referred to in § 20 of the Liquor Law, and it seems to me that it very plainly recognizes them and their validity for all purposes not excepted. The exceptions are that they shall not be received as evidence to show that the liquors now in the casks are the same which were there when the package was imported. This is a matter in which a fraud might be committed by filling the empty barrels, after leaving the custom house. But the identity of the packages themselves, and the legality of their importation, are provable, by the marks and certificates, under the United States laws, which must in any event govern, and which are not, I [think, sought to be infringed by this statute — and could not be.

These are unquestionably, I think, positive proof within the act, so far as they go, unless they are entirely excluded. And yet the certificate is but in the nature of a receipt or declaration, and the marks on the casks are but circumstantial proof, made admissable and applicable only by their correspondence with those in the certificate, and by the presumption that no one would counterfeit them, because such counterfeiting is punishable. Nor do I perceive by what process, except what my brethren deem circumstantial evidence, even the identity of the liquor could be proved. Proof of the condition of the cask being externally and apparently unchanged would be cogent and irresistible evidence, but it rests nevertheless upon presumption, although it is a sound and clear one. The purchaser can not take the cask from the custom house, and follow it in all its wanderings, without sometimes leaving it, and sometimes sleeping; and when it is traced from hand to hand, the final presumption that it is identical, is based upon a long and numerous train of circumstances

alone. We are not to suppose the law requires an impossibility, or means a dishonest evasion; but it does both unless the evidence I have referred to is positive proof within the statute. Although it is in the highest degree improbable that a vessel has been tampered with, which has been watched with great diligence, yet it would be going too far to claim that it is physically impossible. And if this evidence is not "positive proof" within the ordinary sense as used by text writers, then I have no hesitation in saying that, in my judgment, the statute does not refer to that technical use of the term.

But when we come to examine into the real meaning of the text writers, I can draw no conclusion from them which would exclude an admission of the main and precise fact in issue, or any portion of it, from the character of direct or positive testimony. And I think a few instances will show this. The admission is called circumstantial evidence because the witness who swears does not testify to the importation, but merely that the admission was made, and that the proof therefor comes not from the witness' knowledge of a fact in issue, but of another fact by which a fact in issue is proved. Upon the same ground a receipt proved is merely circumstantial evidence, because a witness merely swears to its execution. The transcript, whether sworn or certified, of a recorded deed or judgment, is circumstantial, because the fact sworn or certified is, that it is a true copy of a valid original in the one case, and a copy of another copy of an original in the other. The deed is recorded, and the transcript is but a copy of that copy.

Instances might be multiplied without number. The proof of handwriting of an original deed by any one but a subscribing witness would be entirely circumstantial, on the same hypothesis, if the witness proves it by his knowledge of handwriting, and not by having seen the signature affixed.

I think it will be difficult to realize that such evidence as I have referred to, when offered to prove a payment,

a conveyance, a judgment, or a promissory note, is not direct proof.

The difference between direct and circumstantial evidence is laid down by Mr. Wills to consist in this, namely, that by *direct evidence* is intended evidence which applies directly to the fact which forms the subject of inquiry, the *factum probandum;* circumstantial evidence is equally direct in its nature, but, as its name imports, it is direct evidence of a minor fact, or facts, incidental to, or usually connected with, some other fact as its accident, and from which such fact is therefore inferred.— *Wills, pp.* 15, 16. And Mr. Greenleaf, in section thirteen, refers the proof derived from circumstantial evidence primarily, as in direct evidence, to the veracity of the witness, which is presumptive, and secondarily to the experienced connection between the collateral facts which he proves, and the fact which is in controversy. Other writers use similar language, and there is no important difference on this question, so far as definitions go. But the real question is, whether the directness or indirectness of the evidence depends on the fact whether the witness was, or was not, an eye-witness himself of the main *factum probandum.*

I do not conceive how this can be the true test. All evidence is required to be pertinent to the issue, and must either bear directly upon it, or form a link in a chain of facts which may authorize a jury to infer it. In determining the admissibility of any proof, it must be determined by this tendency. When a witness is asked a question, the immediate inquiry arises, what part of the issue does this tend to prove? If he testifies that he saw a murder, his evidence is directed to the main issue. If he testify that he sold the prisoner a peculiar weapon, that is a circumstance which is material if such a weapon produced the fatal injury, and has a legitimate collateral bearing upon the main issue. It is therefore admissible as circumstantial proof, upon the ground that the possession of

a sword, where a sword cut has been inflicted, is (to use the language of Mr. Wills, above quoted) a minor fact incidental to, or usually connected with, a sword cut as its accident, and from which a possible connection may be inferred, which is made probable by other facts.

But suppose the witness, instead of seeing the murder, or selling the sword, swears that the prisoner admitted that he did the murder, or that he owned the weapon. The fact that an admission had been made, is not a natural incident to the offense in either case. Proving or disproving it to have been made, making it, or not making it, could form no possible part of the offense. It is not the fact that an admission of some kind has been made, but the pertinency of the thing admitted, which determines its relation to the issue. It is whether it goes to the main issue, or to a collateral circumstance, which determines its character as direct or circumstantial evidence, whether sworn to by a witness from knowledge, or from admissions. When a witness swears to the handwriting of a receipt, we call it proving payment, and not proving a presumption. When a transcript is introduced, it proves the judgment, and not the mere clerical act of transcription.—See *Hogan v. Sherman*, 5 *Mich.* 60.

This is evidently the view of Mr. Wills. He professes to deal with every species of circumstantial evidence, and, as a part of it, he has a very full section devoted to "*indirect confessional evidence*," which he commences by declaring that the subject of direct confession does not fall within the province of his essay. And he adverts to some of the principal rules which govern the one, to explain more fully those relating to the other.—*p.* 60, *et seq.* Mr. Burrill adopts, in his text, the rule laid down by Bentham and Best, that "full confessions of guilt, by an accused party, are in the nature of *direct* evidence, and do not properly fall within the scope of a work on circumstantial evidence."—*Burrill's Cir. Ev.* 495.

And, in criticising Mr. Starkie's statement that it is presumptive, because depending on the presumption of veracity, he says with force, "But it seems to be in no other sense presumptive, than all direct evidence, which, as has been shown, rests upon the analagous general presumption that the witness who delivers it speaks the truth.— *P. 495 n. (b).*

I do not think that Mr. Greenleaf expresses any contrary view. He declares deliberate confessions to be among the most effectual proofs in the law (*sec.* 215); and had he regarded them as coming within the range of presumptions of fact, he would hardly have omitted to say so. In section forty-four, he uses very different language concerning the grounds of such presumptions. And if, as he remarks in section one hundred and sixty-nine, admissions and confessions are properly *substitutes* for legal proof, they surely belong, so far as directness or indirectness may be concerned, to the class filled by that in place of which they are made to stand.

These admissions, which were rejected, were offered to establish the main issue, and not a collateral fact. I think they should not have been excluded. If sought to be excluded on any other ground than the supposed distinction of not being in the nature of direct evidence, no such other ground can exist, except it be that they are not of sufficient weight to establish a case. I am not aware of any rule of law which can exclude testimony from the jury because the court thinks it too weak. Its weight, if admissible, is a question of fact, and not of law. But in holding that admissions fall within the class of positive or direct testimony, as recognized by the writers, I do not wish to be understood as conceding that the term "positive proof" has, or was intended to have, under the statute, a technical meaning. This is the first case, so far as I am aware, in which the *admissibility* of testimony has been made to depend on its quality of directness. So long as presumptive evidence is equally admis-

sible with direct (as it is in all cases, unless this is an exception), text writers commit no dangerous error by not drawing accurate lines of distinction. But when the rights of parties are to depend on the correctness of definitions, which have never before been fixed by authority, because never material, I am not prepared to hold that any rule of distinction, even if universally adopted by text writers, for convenience, or from taste, should be received as of binding efficacy. The reasoning of elementary writers may be worthy of respect, but they can not make the law. And I am very strongly inclined to believe that when the question becomes material, if that should ever happen, courts will not exclude evidence as not positive, which has a necessary bearing upon the issue. At all events, I am not prepared to lay down any such rule until there is very decided authority, as well as opinion, for it. Presumptions of some kind belong to all testimony, as long as there is any difference between moral and mathematical certainty.

*Judgment affirmed.*